WILSON v. MARKLEY.

(Filed December 15, 1903.)

1. STATUTES—*General Assembly—Legislature—Evidence—The Code, secs. 1339, 2689, 2867, 2869.*

   A copy of the journal of the legislature deposited with the secretary of state is not evidence for any purpose, and a misnomer of a town in a private act therein does not affect the validity of the act.

2. STATUTES — *General Assembly—Legislature—Journal—Evidence—The Const. N. C., Art. 2, secs. 14, 16, 23.*

   The journal of the legislature is competent evidence only for the purpose of ascertaining whether a law had been passed in accordance with the constitution, article 2, section 14, requiring it to be read three times on three different days in each house and the yeas and nays to be entered on the second and third readings.

3. EVIDENCE—*General Assembly—Journals—Parol Evidence.*

   The journals of the general assembly, when competent as evidence, import absolute verity, and cannot be explained or altered by parol evidence.

ACTION by the Town of Wilson against C. Markley, heard by Judge *G. S. Ferguson* at November Term, 1903, of the Superior Court of WILSON County. From a judgment for the plaintiff the defendant appealed.

*S. G. Mewborn,* for the plaintiff.
*F. A. & S. A. Woodard,* for the defendant.

CONNOR, J. This is an action submitted to the Court upon pleadings properly filed and a special finding of facts by his Honor, a jury trial having been waived, pursuant to the provisions of section 398 of The Code.

His Honor found the following facts:

1. That on the 5th day of March, 1903, the General Assembly of North Carolina passed and ratified "An act to amend the charter of and to authorize the town of Wilson to issue bonds," same being published in the Private Laws of North Carolina, session 1903, as chapter 291.

2. That section 8 of said act provides: "That the town of Wilson is hereby authorized and empowered to create an additional debt for grading, macadamizing and paving the streets and sidewalks and for extending the sewerage and waterworks systems of said town to an amount not exceeding forty thousand dollars, exclusive of the amounts and sums heretofore authorized to be created by the charter of said town, and for that purpose may issue bonds in the name of the town of Wilson, in such denomination and form and payable at such place and time, but running not less than twenty nor more than fifty years, and bearing interest at no greater rate than five per centum per annum and payable semi-annually, as said board of commissioners may determine."

3. That section 9 of said act provides: "That none of said bonds shall be issued until approved by a majority of the qualified voters of said town at a public election to be held at such time and under such regulations as the board of commissioners may prescribe, at which election those favoring the issue of bonds shall vote 'Issue,' and those opposing shall vote 'No Issue.'"

4. That after due notice an election was held in said town of Wilson on Tuesday, May 5, 1903, upon the question of the said town's issuing said bonds.

5. That at said election there were 440 votes cast for "Issue," and 16 votes were cast for "No Issue"; that the total number of qualified voters of said town of Wilson for said election was 667, and that said election was held and conducted in all respects regularly and in conformity to and with

the laws of the State, according to the provisions and require-
ments of the charter of the town of Wilson.

6. That thereafter the Board of Commissioners of the
town of Wilson instructed and authorized the Mayor, Doane
Herring, to offer by advertisement said bonds for sale, pur-
suant to the provisions of said act.

7. That the defendant C. Markley having made and sub-
mitted his bid for $5,000 of said bonds, the said board of
commissioners for said town accepted the bid so made and
submitted by the defendant for said amount of bonds so bid
for by him, and the said town of Wilson, the plaintiff, has
had prepared in due form said bonds and has offered and ten-
dered same to the defendant for his acceptance, and has
demanded of him the payment therefor according to his said
bid, but the defendant refuses to accept said bonds and to pay
the plaintiff therefor.

8. That the said bill authorizing the holding of said elec-
tion and the issuing of said bonds was introduced in the
Senate on February 26, 1903, and passed its several readings
in accordance with Article II, section 14 of the Constitution,
all of which fully and affirmatively appears by the inspection
of the Senate Journal. The original House Journal of
March 2, 1903, contains the following entry: "S. B. 1063,
H. B. 1716, a bill to be entitled an act to amend the charter
of and to authorize the town of Wilson to issue bonds. Re-
ferred to the Committee on Corporations."

9. That two copies of said Journal were made, one of which
was to be filed in the office of the Secretary of State and one to
be delivered to the Public Printer; that the copy furnished to
the Secretary of State, now on file in his office, is as follows:
"Messages from the Senate: 'S. B. 1016, H. B. 1716, a bill
to be entitled an act to amend the charter and to authorize the
town of *Weldon* to issue bonds.' Referred to Committee on
Corporations." That the copy furnished the Public Printer
for publication is an exact copy of the original House Journal.

10. That the House Journal of March 4, 1903, contains the following entry: "H. B. 1716, S. B. 1063, being a bill to amend the charter of and to authorize the town of Wilson to issue bonds, passes on its second reading by the following vote: Ayes (giving names of members voting), 91; those voting in the negative, none." Under date of March 5, 1903, said Journal contains the following entry: "H. B. 1716, S. B. 1063, being a bill to amend the charter of and to authorize the town of Wilson to issue bonds, passes on its third reading by the following vote: Ayes (giving names of members voting), 96; those voting in the negative, none."

11. That the endorsements on said bill while in the House of Representatives are as follows:

"Passed first reading and referred to Committee on Corporations, March 2, 1903."

"Reported to the House March 3, 1903, Fav."

"Passed second reading, ayes and noes, March 4, 1903. Cal."

"Passed third reading, ayes and noes, March 5, 1903, and ordered enrolled."

Said bill on its face is numbered "S. B. 1063, H. B. 1716." (Signed) "F. D. Hackett, Principal Clerk."

The Constitution, Art. XI, sec. 16, provides that "Each house shall keep a journal of its proceedings, which shall be printed and made public immediately after the adjournment of the General Assembly."

Section 24: "All bills and resolutions of a legislative nature shall be read three times in each house before they pass into laws, and shall be signed by the presiding officers of those houses."

This Court, in *Scarborough v. Robinson*, 81 N. C., 409, held that the signatures of the presiding officers were essential to the validity of an act of the General Assembly, and that

although the Journal showed that a bill had passed both houses and had been enrolled and ratified, whereas in truth it had not received the signatures of the presiding officers, the Court had no power to compel by a writ of *mandamus* the President of the Senate and Speaker of the House to sign the bill.

In *Carr v. Coke,* 116 N. C., 223, 47 Am. St. Rep., 801, 28 L. R. A., 737, it appeared from the complaint, and for the purpose of the motion to dismiss the action it was taken as true, that the bill in controversy was signed by the presiding officers of both houses, duly certified to and received by the Secretary of State, although it appeared from the Journals that it had not passed its several readings.    It was stamped by the clerk as having passed in accordance with the Constitution.    This Court held that it had no power to "go behind" the signatures of the presiding officers and examine the Journals for the purpose of contradicting the certificate of ratification.

These authorities would seem to establish the law in this State that the Court has no power to examine the Journals and they are not competent to be received in evidence to show the passage of an act or to contradict the certificate of the presiding officers that an act had been duly read three times and passed each house of the General Assembly, excepting acts coming within the provisions of Art. II, sec. 14, thus adopting the doctrine that "the Journal is of good use for the intercourse between the two houses and the like, but when the act is passed the Journal is expired.    The Journals of Parliament are not records and cannot weaken or control a statute which is a record and to be tried only by itself."    *Rex v. Arundel,* Hobart, 109, 111 Trinity Term, 14 Jac.; *Broadnax v. Groom,* 64 N. C., 244.    The law in consonance with this doctrine is strongly and clearly stated by *Chief Justice Beasley* in *Pangborn v. Young,* 32 N. J. L., 29: "When an act has been passed by the Legislature and signed by the Speaker of each House, approved by the Governor, as authen-

ticated by his signature, and filed in the office of the Secretary
of State, an exemplification of it under the great seal is con-
clusive evidence of· its *existence and its contents.* It is not
competent for the Court to go behind this attestation or to
admit evidence to show that the law actually voted on and
passed and approved by the Governor was variant from that
filed in the office of the Secretary of State. The minutes of
the two houses, or either of them, kept under the requirement
of the Constitution, will not be received as evidence for such
purpose." The able and learned opinion of the· Chief Justice
is justly referred to by the editor of Greenleaf on Evidence
(16th Ed.), sec. 482, as "an arsenal of arguments" on this
subject. To those at all familiar with the manner in which
the records of the General Assembly are made up the follow-
ing observations will seem appropriate: "In the present state
of the law I am satisfied that an attempt to investigate the
manner in which laws have been enacted by our legislative
bodies would be attended by far greater evils than those we
should be likely to remedy. How shall we proceed and when
shall we stop ? It is said 'have recourse to the Journals, which
certainly are required to be correctly kept and for some pur-
poses evidence.' The answer is: we have painful evidence
before us that they are far more likely to be erroneous than
the enrolled bills."

In the passage of such bills as the one in controversy, in
addition to the provisions of the Constitution noted, they
are required by Art. II, sec. 14 of the Constitution to be read
three several times in each House of the General Assembly
and passed .on three several readings, which readings shall
be on three different days, and agreed to· by each House,
respectively, and the yeas and nays on the second and third
readings shall be enrolled on the Journal. This Court has
held in a number of cases, beginning with *Bank v. Commis-
sioners,* 119 N. C., 214, 34 L. R. A., 487, that this require-

ment is mandatory and its observance essential to the validity
of the act. That the purchasers of bonds issued pursuant to
such act are fixed with notice of a failure to comply with the
constitutional requirement. This principle logically results
in the doctrine that the Courts will examine the Journals for
the purpose of ascertaining the facts thus held to be essential
to its validity. This in nowise conflicts with the general
principle, but is an exception to it in so far as it is necessary
to ascertain whether the act as ratified has been passed in
accordance with the Constitution. It will be observed that
his Honor finds from an inspection of the Journal that the
act in question was passed in strict accordance with Art. II,
sec. 14. It is perfectly clear that the bill which thus passed
the House is the *same bill* which in the same manner passed
the Senate and was, by message from the Senate, duly trans-
mitted to the House. In the original Journal it is correctly
described by number and title, as it is at each stage in its
legislative progress through the House. It is the same bill
which was enrolled and ratified by the presiding officers,
certified to and received by the Secretary of State and by him
certified to the Public Printer and published in the "Private
Laws of the session of 1903." Chapter 291, page 692. Pur-
suant to section 2689 of The Code, the Secretary of State
certifies: "I, J. Bryan Grimes, Secretary of State, hereby
certify that the foregoing (manuscript) are true copies of
the original acts on file in this office." This is made compe-
tent evidence in the Courts by section 1339 of The Code. Sec-
tion 2867 of The Code provides that "the principal Clerk
of the Senate and House of Representatives, as soon as may
be practicable after the close of each session, shall deposit in
the office of the Secretary of State the Journals of the Gen-
eral Assembly," etc. Section 2869 requires the Secretary of
State, within thirty days after the termination of each session,
to cause to be published by the State Printer all the laws

passed at such session, and each volume shall contain his cer-
tificate that it was published under his direction from enrolled
bills on file in his office. A careful examination fails to dis-
close any statute making it the duty of the Chief Clerk of
the House to make, as an official document, copies of the
Journal for the printer and Secretary of State. It is the
*Journal,* which we understand to be the original, which is to
be filed in the office of the Secretary of State, and it is this
original or an exemplification made therefrom by him which,
when competent, is to be used in evidence. It would be a
strange result and a serious menace to the integrity of legis-
lative acts if an erroneous copy made by a Clerk in transcrib-
ing for any purpose the Journal should be received in evi-
dence to invalidate an act of the General Assembly duly rati-
fied, certified to and published by the Secretary of State.
Such a copy as that described in the findings of fact by the
Court would not be admissible for any purpose, and if ob-
jected to would have been excluded by his Honor. The pub-
lication in the Private Laws is evidence of the terms of the
act. The Journal is competent only for the purpose of ascer-
taining whether it had been passed in accordance with Art.
II, sec. 14 of the Constitution. We think it proper to say
that the testimony of the Chief Clerk was not competent for
any purpose. In the view which we take of the law it was
harmless. The Journals and other records of the General As-
sembly must be received, when competent, as they are writ-
ten and filed with the Secretary of State. It would be a
dangerous innovation to permit parol evidence to be heard
to explain or alter them. For the purpose for which they are
made, as memorials of the proceedings of the General Assem-
bly, they import absolute verity and truth; they must stand
as they are made and speak for themselves. As to them, what
is written is written, neither to be explained by extrinsic evi-
dence, added to or taken from. The judicial department of

the government dare not permit them to be explained away or changed. We may construe them to ascertain the legislative will as expressed in these memorials, but beyond that border line we may not pass.

Upon the facts found by his Honor we are of the opinion that the act in question is in all respects valid and the bonds issued pursuant to its provisions valid obligations of the town of Wilson.

The judgment is
Affirmed.